# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-1754

_____

Northwest Airlines, Inc.

*Creditor - Appellee*

v.

Professional Aircraft Line Service

*Debtor*

Westchester Fire Insurance Company

*Garnishee - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 8, 2014
Filed: January 14, 2015

_____

Before RILEY, Chief Judge, WOLLMAN and BYE, Circuit Judges.

_____

RILEY, Chief Judge.

   This case began with an uncontrolled, runaway commercial aircraft at Las Vegas's McCarran International Airport (McCarran Airport). After the aircraft came

to a rest at the bottom of an embankment, the resulting property damage and loss-of-use of the aircraft totaled over $10 million. The aircraft's owner, Northwest Airlines, Inc. (Northwest), obtained a default judgment in Minnesota state court against Professional Aircraft Line Service (PALS), the maintenance company responsible for the wreck. In this garnishment action, Northwest seeks to recover part of the amount of this default judgment from PALS's insurer, Westchester Fire Insurance Company (Westchester). The district court granted summary judgment in Northwest's favor. Although this case raises unanswered questions of state law, we ultimately agree with the district court's[1] reasoning, and therefore affirm.[2]

## I.  BACKGROUND

### A.  Insurance Coverage and Requirements

PALS is an aircraft maintenance company that services commercial airplanes at McCarran Airport in Clark County, Nevada. PALS obtained a Temporary Operating Permit (permit) with Clark County allowing PALS to operate at McCarran Airport.[3] The permit required PALS to maintain a minimum level of insurance for certain specified coverage types, none of which included hangarkeepers liability insurance.

Clark County also has a compulsory insurance ordinance relating to McCarran Airport:

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

[2]We have appellate jurisdiction under 28 U.S.C. § 1291.

[3]Although both parties cite the permit as if it were in effect during the February 6, 2002, incident, the permit states an effective date of February 1, 2001, and provides, "The term of this Permit shall be for a period not-to-exceed one hundred eighty (180) days from the effective date." The record shows successive temporary permits were issued to replace prior ones.

Each operator not otherwise providing insurance as hereinafter set forth pursuant to an existing agreement with Clark County, Nevada, shall, at its own expense, keep in force insurance of the following types and in not less than the following amounts, . . . insuring itself against all liabilities for accidents arising out of or in connection with the operator's use and occupancy of and/or operations at the airport . . . :

. . .

> (c) Hangarkeepers liability insurance in an amount adequate to cover any non-owned property in the care, custody and control of the operator on the airport, but in any event in an amount not less than five million dollars, combined single limit.

Clark County, Nevada, Code of Ordinances (Clark County Code) § 20.10.020.

PALS obtained hangarkeepers liability insurance from Westchester with $5 million per occurrence and per aircraft limits. As a condition of coverage, the policy required PALS to ensure that Westchester was notified "as soon as practicable" of any covered claim or suit against PALS. The policy also required PALS to cooperate with Westchester "in the investigation, settlement or defense of" any claim or suit against PALS.

## B. Northwest and the Underlying Accident

Northwest contracted with PALS to service and maintain Northwest's aircraft at McCarran Airport. The agreement between Northwest and PALS required PALS to indemnify Northwest for any loss arising from the negligence of PALS's employees and required PALS to maintain at least $25 million of commercial general liability insurance, including hangarkeepers liability coverage.

On February 6, 2002, a PALS employee failed to engage properly the parking brake on a Northwest aircraft. As a result, the uncontrolled aircraft rolled down an

embankment, causing more than $7 million in property damage to the aircraft and more than $3 million for loss of use.

## C.     Prior Litigation

In a letter in early November 2003, Northwest's counsel informed Westchester of the accident. Nearly a year later, in October 2004, Northwest served PALS with a Minnesota state court complaint seeking damages for the accident. PALS never responded to the complaint. On November 15, 2004, Northwest advised Westchester of the lawsuit and potential default judgment and demanded Westchester tender the $5 million policy limit. On January 4, 2005, having received no response from PALS, Northwest moved for default judgment. The Minnesota state court granted the motion and entered a default judgment against PALS on January 10, 2005, for over $10 million.

In December 2005, Westchester sued Phil Mendez, PALS's owner, in the United States District Court for the District of Nevada, seeking a declaration it had no obligation to provide PALS coverage in light of PALS's failure to cooperate with Westchester or notify Westchester of the aircraft accident. See Westchester Fire Ins. Co. v. Mendez, No. 2:05-CV-01417-PMP, 2010 WL 2694960, at *2 (D. Nev. July 1, 2010). Northwest moved to intervene to protect its interest in the proceeds of the Westchester policy, and the Nevada federal court granted the motion. See id. Because PALS failed to "meaningfully participate" in the Nevada suit, the Nevada federal court granted Westchester's motion for default judgment and declared Westchester was not obligated to pay the loss. Id. The Nevada federal court also bound Northwest to the judgment because Northwest chose voluntarily to intervene. See id. On appeal, the Ninth Circuit vacated the judgment and remanded, concluding Northwest could not be bound by PALS's failure to defend itself. See Westchester Fire Ins. Co. v. Mendez, 585 F.3d 1183, 1190 (9th Cir. 2009).

-4-

On remand, the Nevada federal court held Westchester was entitled to a default judgment against PALS but declined to decide whether Westchester could be directly liable to Northwest.  See Mendez, 2010 WL 2694960, at *6, *8-9.  Instead, the Nevada federal court determined Northwest would need to raise a direct claim against Westchester in a separate lawsuit.  See id. at *6.

### D.     This Case

Following the decision of the Nevada federal court, Northwest filed this garnishment suit against Westchester in Minnesota state court.  Westchester removed to federal court and argued PALS's failure to provide notice and to cooperate extinguished Westchester's payment obligation.  Northwest moved for summary judgment, arguing that because PALS was subject to Clark County's mandatory insurance ordinance, PALS's failure to provide notice and to cooperate did not permit Westchester to avoid covered liability.  The district court conducted a choice-of-law analysis, concluding that neither the Minnesota nor Nevada state courts have addressed what it called the "compulsory insurance doctrine" in situations such as this, but that both appear willing to do so.  Applying Minnesota law, the district court concluded the Clark County ordinance obliged Northwest to provide hangarkeepers liability insurance to protect parties like Northwest.  Given this purpose, the district court reasoned insurance coverage could not be avoided for an insured's simple failure to satisfy the technical post-loss conditions on his statutorily mandated coverage.  Because this reasoning disposed of Westchester's bases for denying coverage, the district court granted summary judgment in Northwest's favor.  Westchester appeals.

## II.    DISCUSSION

"On appeal, this court reviews grants of summary judgment de novo, and reviews the evidence and all reasonable inferences in the light most favorable to the nonmoving party."  Moody v. Vozel, 771 F.3d 1093, 1096 (8th Cir. 2014) (quoting

Davis v. Jefferson Hosp. Ass'n, 685 F.3d 675, 680 (8th Cir. 2012)) (internal marks omitted).

Westchester's appeal is limited solely to legal arguments challenging the district court's application of what it called the "compulsory insurance doctrine" to the circumstances of this case. "'Minnesota law applies, as Minnesota is the forum state and neither party has raised a choice-of-law claim'" on appeal. Netherlands Ins. Co. v. Main St. Ingredients, LLC, 745 F.3d 909, 913 (8th Cir. 2014) (quoting Progressive N. Ins. Co. v. McDonough, 608 F.3d 388, 390 (8th Cir. 2010)).

A.      Scope of the Clark County Ordinance

Westchester argues the compulsory insurance doctrine cannot apply because PALS was under no obligation to carry hangarkeepers liability insurance. Westchester reasons the ordinance excepts PALS from its insurance requirements because PALS, by virtue of the insurance obligations in its operator's permit, was "otherwise providing insurance as hereinafter set forth pursuant to an existing agreement with Clark County." Clark County Code § 20.10.020. Westchester reads this phrase to mean the ordinance's "insurance provisions apply unless insurance requirements are otherwise provided for under an agreement with the County." This reading—simply requiring an agreement containing *any* insurance requirements—ignores the ordinance language excepting an operator *only* if its agreement with Clark County requires the operator to provide the insurance "*as . . . set forth*" in the ordinance's listed insurance obligations. Id. (emphasis added). Giving effect to this phrase, the district court read the ordinance as exempting operators "from its requirements with respect to a particular type of insurance only to the extent that those operators are subject to county agreements that require them to obtain that type of insurance." We need not say whether the district court's reading is best because the prefatory language makes clear to us that the ordinance's requirement as to a particular type of insurance applies where an agreement is silent as to that type of insurance. Here, PALS's permit did not refer to hangarkeepers

-6-

liability insurance, so under any reasonable reading, PALS was not excused from the ordinance's hangarkeepers requirement.

## B.    Compulsory Insurance Doctrine

Having concluded the ordinance applied to PALS, we turn to whether the ordinance affects Westchester's obligation to pay Northwest.

Ordinarily, an injured party's right to recover depends on the insured's coverage, and an insurer's obligation to indemnify the insured depends on the insured satisfying its policy responsibilities. See Franklin v. Carpenter, 244 N.W.2d 492, 495 (Minn. 1976) (noting that with liability insurance "the rights of the [injured third parties] are derived from those of the insured" (alteration in original) (quotation omitted)). However, "[i]n the case of liability policies issued pursuant to, and in compliance with, compulsory insurance or financial responsibility statutes, the rule followed generally . . . is that the injured person is not subject to defenses arising out of the breach of conditions subsequent to the accident even though they would be available to the insurer as against the insured." 7A Steven Plitt, et al., Couch on Insurance § 106:27 (3d ed. 2014); accord Young v. Allstate Ins. Co., 282 S.E.2d 115, 116 (Ga. 1981) (stating this is the majority rule); Kambeitz v. Acuity Ins. Co., 772 N.W.2d 632, 638 (N.D. 2009). This is because "such statutes are for the benefit of members of the public and not of the insured," Couch on Insurance, supra § 106:27, and most courts reason the "beneficial purpose of compulsory insurance would be thwarted in the event the insurer be permitted technical defenses under the policy relating to conditions" the performance of which the injured person is wholly unable to control, Royal Indem. Co. v. Olmstead, 193 F.2d 451, 453 (9th Cir. 1951). See Gabrelcik v. Nat'l Indem. Co., 131 N.W.2d 534, 536 n.7 (Minn. 1964) (citing several of these cases and explaining, "The rationale is that the licensing authority requires insurance coverage for the public's protection and this rule prevents thwarting that objective"); see also Young, 282 S.E.2d at 116; Cotner v. Grissley, 447 S.W.2d 603, 605 (Ky. 1969).

Nearly fifty years ago, the Minnesota Supreme Court considered a case involving a driver who maintained liability coverage consistent with his obligation under Minn. Stat. § 170.40, subd. 6(1) (1969), but who, after a collision, "fail[ed] to notify the insurer that the car involved in the accident was a replacement of the one originally insured." Nimeth v. Felling, 165 N.W.2d 237, 238 (Minn. 1969). Despite the insured's failing, the Minnesota Supreme Court permitted the injured third party to recover from the insurer directly, relying on the "ample authority to the effect that the insurer on a compulsory insurance liability policy may be held liable to one injured by the insured notwithstanding the fact that the insured himself has lost his rights under the policy by failure to comply with its terms and conditions." Id. at 239. Because the liability policy was statutorily mandated and the injured party was "a member of the public for whose benefit the legislature has required issuance of" the policy in the first place, "[t]he rights of the injured person [we]re *independent of* and [we]re *not derived from* those of the insured." Id. (emphasis added). The court also reasoned that the legislature expressly incorporated these principles into the statute itself, which stated that the insurer's liability "shall become absolute whenever injury or damage covered by said motor vehicle liability policy occurs; . . . and *no violation of said policy shall defeat or void said policy*," Minn. Stat. § 170.40, subd. 6(1) (emphasis added). See Nimeth, 165 N.W.2d at 239.

Although the compulsory insurance doctrine appears generally accepted among jurisdictions, particularly with respect to auto insurance, it has not often been applied in other contexts. Given the unusual circumstances here, Westchester identifies a number of issues which make the doctrine's application in this case a close question.

### 1.    Statutory Language and Purpose

Westchester points to the absence of language in the ordinance making the insurer's liability "'absolute' upon the occurrence of a covered incident" or "stat[ing] that post-incident conduct of the insured cannot void coverage." See, e.g., Minn. Stat. § 170.40, subd. 6(1). While this language does distinguish the ordinance here

from the statute in <u>Nimeth</u>, it fails to put the present situation beyond the rationale of the compulsory insurance doctrine. "Most of the cases dealing with this question involve statutes or policies specifically depriving the insurer of the kind of defense urged here," <u>Royal Indem.</u>, 193 F.2d at 454, but the reasons for denying the insurer these defenses do not necessarily depend on specific statutory language—the rationale instead focuses on effectuating the statute's purpose. <u>See</u> <u>Kambeitz</u>, 772 N.W.2d at 638 (deciding the doctrine can be "based either on specific statutory provisions or the overriding purpose of statutory schemes"). For this reason, courts have applied the doctrine where the ordinance's clear purpose was to protect a class of the public to which the injured party belongs. <u>See</u> <u>Royal Indem.</u>, 193 F.2d at 454; <u>Young</u>, 282 S.E.2d at 117; <u>Allen v. Canal Ins. Co.</u>, 433 S.W.2d 352, 354 (Ky. 1968); <u>Ott v. Am. Fid. & Cas. Co.</u>, 159 S.E. 635, 636 (S.C. 1931). Although Westchester contends the ordinance exists for other reasons, we agree with the district court that the Clark County ordinance is intended at least in part to "protect[] injured third parties such as [Northwest]."

Westchester also correctly observes that courts encounter the compulsory insurance doctrine most often in the context of statutes requiring auto liability insurance. The doctrine, however, is not necessarily limited to that paradigm, <u>see</u>, <u>e.g.</u>, <u>Capitol Indem. Corp. v. Lowe</u>, 166 F.3d 346 (10th Cir. 1998) (unpublished table decision), and Westchester has not provided a case suggesting otherwise.

Westchester next maintains "Northwest was not an injured member of the general public" and "PALS was not an entity either serving or directly interacting with members of the general public." The ordinance's protected class need not embrace the general public in its entirety because the doctrine applies insofar as the injured party belongs to the protected *segment* of the public. <u>See</u> <u>Royal Indem.</u>, 193 F.2d at 453 (declaring that for the doctrine to apply, the plaintiff must be "an injured member of the public *within the class sought to be protected* by statute" (emphasis added)); <u>see</u>, <u>e.g.</u>, <u>Dave Ostrem Imports, Inc. v. Globe Am. Cas./GRE Ins. Grp.</u>, 586

N.W.2d 366, 368 (Iowa 1998) ("motoring public"); <u>Great Am. Ins. Co. v. Brad Movers, Inc.</u>, 382 N.E.2d 623, 626 (Ill. Ct. App. 1978) ("members of the public utilizing public warehouses"). The class protected here is anyone whose property is "in the care, custody and control of the operator on the airport," Clark County Code § 20.10.020(c), whether it be a commercial aircraft or otherwise.[4]

## 2. Contractual Relationship

Westchester next makes a number of arguments drawing attention to the contractual relationship between PALS and Northwest. Westchester first proposes this case is unlike the negligent driver situation (where this doctrine most often arises) because PALS injured its "contracting partner" in the context of a "private contractual relationship." Westchester neglects to demonstrate how this fact undermines the doctrine's application. The ordinance protects "*any* non-owned property in the care, custody and control of the operator on the airport," <u>see</u> Clark County Code § 20.10.020(c) (emphasis added), giving no regard to the presence or absence of an ongoing business relationship.

Westchester mainly contends the compulsory insurance doctrine does not apply "where injured parties have some other avenue available . . . to recover compensation" or where it is not "'wholly outside the ability of the injured person' to secure performance by the tortfeasor of policy conditions such as notice and cooperation." (Quoting <u>Royal Indem.</u>, 193 F.2d at 453). We do not disagree with this reasoning as a logical matter, but the record here does not suggest Northwest had any other unexplored avenue of compensation for the damages sought here or any

---

[4]Westchester also reasons the Clark County ordinance "does not apply to a broad class of actors analogous to parties seeking a license to sell propane to the public at retail, operating a public warehouse, providing taxicab services to the public or operating a motor vehicle on public roads," but we do not understand (and Westchester does not explain) how the number of prospective insureds is relevant to the rationale behind the compulsory insurance doctrine.

effective means of securing PALS's compliance with the policy conditions. The simple existence of a continuing business relationship with PALS did not necessarily give Northwest control over whether the policy conditions were met.

First, to the extent Westchester claims Northwest had "its own insurance," Northwest actually recovered only part of its loss, and the district court took this source of compensation into account, awarding Northwest only for the *uncompensated* portion of damages—$4,089,446.32.

Second, Westchester asserts Northwest must have known the identity of PALS's insurer and could have supplied notice itself because, under their agreement, Northwest was contractually entitled to know the identity of PALS's insurer. Relying only on these contractual rights, Westchester faults Northwest for failing to provide earlier notice to Westchester when "Northwest was fully aware of who PALS' insurer was, and fully able to give Westchester notice." Yet Westchester provides no record citation to support this assertion, and we find no indication in the record that Northwest actually succeeded in obtaining this information from PALS.

Third, although Northwest did continue its business relationship with PALS, it is wrong to assume, as Westchester does, that Northwest could have leveraged its business as PALS's customer or its contractual rights to prod PALS into satisfying the policy conditions. Westchester even suggests Northwest should have threatened to terminate its business agreement with PALS. There is no evidence of undue delay or laxity on Northwest's part. And given PALS's and its owner's proven record of failing to respond to communications, court summonses, civil complaints, and subpoenas (all of which led to two unfavorable default judgments), we cannot assume Northwest could have done more to ensure PALS's cooperation even if it had learned sooner of Westchester's policy. Nor is it reasonable to assume Northwest could walk away and terminate its business relationship with PALS outright, even if it was within Northwest's contractual rights to do so.

-11-

Throughout late 2003 and early 2004, Northwest and its insurer made Westchester aware of Northwest's claim, requested Westchester's coverage position, and provided considerable documentation of the incident. After reviewing Northwest's claim and information, Westchester agreed the incident occurred within the scope of the policy, identifying the only defects as being the absence of notice *from PALS* and *PALS's* lack of cooperation. By summer 2004, Westchester determined the claim was not covered due to lack of notice from PALS. Thereafter, Westchester did not respond to Northwest's June 30, 2004, request for a coverage position or Northwest's November 15, 2004, letter informing Westchester of the Minnesota state court litigation and the impending possibility of a default judgment. On this record, we find little fault with Northwest's communication with Westchester.

Neither the Minnesota Supreme Court nor any other court we could find has considered whether to apply the compulsory insurance doctrine in circumstances as unusual as those presented here. Yet the doctrine has been applied with significant consistency across multiple jurisdictions. Applying the reasoning and principles from those cases, we predict the Minnesota Supreme Court would find in Northwest's favor. We do not perceive a principled reason why the Minnesota Supreme Court would place this case outside the rationale of Minnesota's compulsory insurance doctrine.

Finally, this doctrine exists at a balance point between the interests of the injured party in recovering and the insurer in obtaining prompt notice and cooperation. That being the case, it is certainly relevant in our assessment of this unusual scenario that (1) beginning soon after Northwest learned of the Westchester policy and over a year before Northwest filed suit, Northwest gave Westchester actual notice of its claim, the lawsuit, and the possibility of a default judgment, and (2) it was Westchester who spurned the notice from Northwest, discontinued communications, and, despite its actual knowledge, chose not to participate in the Minnesota litigation.

## C.     Motive for Purchasing Insurance

The district court concluded that under the compulsory insurance doctrine, an insurer could not avoid paying the injured party for the insured's lack of notice or cooperation if "(1) the insurance policy at issue [was] purchased to comply with the requirements of a statute; and (2) the plaintiff [was] an injured member of the public within the class protected by the statute." Arguing the district court's first requirement was not met, Westchester claims PALS purchased the policy only intending to comply with its obligation to carry hangarkeepers liability insurance under the Northwest-PALS service agreement. Assuming PALS's subjective intent is relevant, there is no evidence in this record indicating PALS's motive in purchasing its Westchester policy—PALS could have purchased coverage intending to comply with the contract, the ordinance, or both.

## III.     CONCLUSION

For the foregoing reasons, we affirm.

_____